## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL MEADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-1718-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

## **I.    INTRODUCTION**

Plaintiff Michael Meade ("Meade") filed this action on November 29, 2017 against the

defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration

(the "Commissioner"). Meade seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's May 24, 2017 final decision, denying Meade's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434 and

§§ 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Currently before the court are cross-motions for summary judgment filed by Meade and

the Commissioner. (D.I. 14; D.I. 16) Meade asks the court to remand his case for further

administrative proceedings. (D.I. 15 at 21) The Commissioner moves the court to affirm the

ALJ's decision. (D.I. 17 at 25) For the reasons set forth below, Meade's motion for summary

judgment is granted-in-part (D.I. 14), the Commissioner's cross-motion for summary judgment is

denied (D.I. 16), and the case is remanded for further proceedings.[1]

---

[1] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this
matter through final judgment and the case was assigned to the undersigned judicial officer on
January 11, 2018. (D.I. 9)

## II. BACKGROUND

### A. Procedural History

Meade protectively filed his application for DIB on September 4, 2014, claiming a disability onset date of July 15, 2014 due to impairments in his knees, back, shoulder, and feet, as well as mild arthritis, high blood pressure, diabetes, sleep apnea, and impotence. (D.I. 12-5 at 2-3; D.I. 12-6 at 5) The claim was denied initially on December 23, 2014, and upon reconsideration on August 19, 2015. (D.I. 12-3 at 15, 28) Thereafter, Meade filed a written request for a hearing, which occurred on April 13, 2017. (D.I. 12-4 at 16-17, 41) At the hearing, Meade amended his alleged disability onset date to February 12, 2015,[2] and he alleged memory impairment issues starting before that date. (D.I. 12-2 at 39-42) On May 24, 2017, Administrative Law Judge C. Howard Prinsloo (the "ALJ") issued an unfavorable decision, finding that Meade was not disabled under the Act. (*Id.* at 16-30) The Appeals Council denied Meade's request for review on October 3, 2017, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4)

On November 29, 2017, Meade brought the instant civil action challenging the ALJ's decision. (D.I. 2) On June 25, 2018, Meade filed a motion for summary judgment, and on August 23, 2018, the Commissioner filed a cross-motion for summary judgment. (D.I. 14; D.I. 16)

---

[2] Meade's date last insured was March 31, 2016. (D.I. 12-2 at 18)

**B. Medical History[3]**

Meade was born on February 12, 1960, and he was fifty-five on his amended alleged disability onset date. (D.I. 12-2 at 39) Meade has a college education and previously played in the National Football League ("NFL") from 1982 to 1985. (D.I. 12-2 at 44; D.I. 12-6 at 6; D.I. 12-7 at 4) Thereafter, Meade worked in stock sales, mortgage sales, and general sales. (D.I. 12-2 at 62) The ALJ concluded that Meade has the following severe impairments: post-concussion syndrome, degenerative joint disease, degenerative disc disease, and obesity. (*Id.* at 18)

In August 2009, Meade was evaluated by Kenneth Nudleman, M.D., a clinical neurologist, in connection with litigation against the NFL. (D.I. 12-7 at 3) Meade reported that he was hit on several occasions during his football career, but was not rendered unconscious, and he gets headaches once or twice a month with a pain level of six out of ten. (*Id.* at 4) Meade described forgetfulness and delay in processing information. (*Id.*) Dr. Nudleman observed that Meade's mood and affect were normal, but he demonstrated some memory loss. (*Id.*) Dr. Nudleman diagnosed Meade with posttraumatic head syndrome, posttraumatic headaches, and a sleep disorder, describing these conditions as minimal or slight. (*Id.* at 5) Dr. Nudleman recommended that Meade avoid work in an environment requiring constant multitasking or an environment in which he could be subject to head trauma. (*Id.*) Dr. Nudleman imposed no other limitations on Meade's ability to work. (*Id.*)

On November 24, 2014, Meade saw Dr. Rachel Brandenburg for a psychological consultative evaluation. (D.I. 12-8 at 61) Dr. Brandenburg observed Meade's behavior and administered both the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") and the

---

[3] Meade challenges the ALJ's analysis of his mental impairments, but he raises no objections to the ALJ's analysis of his physical impairments. Therefore, the court does not summarize the medical evidence regarding Meade's physical impairments.

Wechsler Memory Scale-Fourth Edition ("WMS-IV"). (*Id.* at 61-65) Dr. Brandenburg reported that Meade was friendly, engaging, and made good eye contact. (*Id.* at 61) His attention and concentration were good, and he was able to sit comfortably for 2½ hours while testing. (*Id.*) Dr. Brandenburg observed that although Meade appeared nervous during the assessment and became frustrated with his perceived inability to perform well on the memory testing, he became more relaxed as the testing continued. (*Id.*) Under the WAIS-IV, Meade achieved above average in perceptual reasoning and working memory, average in verbal comprehension and processing speed, and high average in his full-scale IQ, with a score of 111. (*Id.* at 62; D.I. 12-3 at 24) Dr. Brandenburg indicated that Meade's WMS-IV scores were lower than predicted after his actual WAIS-IV scores, suggesting the presence of memory impairment. (D.I. 12-8 at 63-64)

In December 2014, state agency psychiatrist Aroon Suansilppongse, M.D. reviewed Meade's medical history. (D.I. 12-3 at 9-10) Dr. Suansilppongse found that Meade's mental impairments do not cause more than mild limitations with respect to his activities of daily living, social functioning, concentration, persistence, or pace, and therefore are non-severe. (*Id.*) Dr. Suansilppongse observed that Meade was not receiving psychiatric treatment at the time of the evaluation. (*Id.*)

In May 2015, Meade visited Walter E. Afield, M.D. for a neuropsychiatric evaluation in connection with the NFL litigation. (D.I. 12-8 at 68-72) During the examination, Meade reported his history of issues with memory, multitasking, concentration, and driving. (*Id.*) Dr. Afield concluded that Meade showed moderate levels of dementia and diagnosed him with neurocognitive impairment, chronic pain, photophobia, balance problems due to brain dysfunction, tinnitus, major depression and posttraumatic stress disorder. (*Id.*) Dr. Afield recommended further testing and evaluation. (*Id.*)

4

On May 21, 2015, Meade visited neurologist Robert Martinez, M.D. in connection with the NFL litigation. Dr. Martinez observed that Meade was awake, alert, and oriented during the exam. (D.I. 12-8 at 79-80) Meade was able to subtract 7 from 100 only three times, and he had difficulty drawing a clock with a specific time and drawing a three-dimensional box. (*Id.*) Dr. Martinez indicated that Meade was unable to remember three objects for five minutes. (*Id.*) Dr. Martinez reported that Meade had met the criteria for a level 1.5 neuro-cognitive impairment based on the Montreal Cognitive Assessment Scale. (D.I. 12-8 at 77-81) A year later, in May 2016, Dr. Martinez provided another report, which was almost identical to the May 2015 report, but it also incorporated references to Dr. Afield's testing. (D.I. 12-9 at 57-62)

In July 2015, Meade followed up with Dr. Afield and described requiring assistance with everyday activities around the house. (D.I. 12-9 at 16-17) Dr. Afield noted that Meade's memory was very bad, he had problems speaking, and he was inflexible in social situations. (*Id.* at 16) Dr. Afield diagnosed Meade with "a permanent neurocognitive impairment of substantive severity," and he prescribed Adderall and recommended cognitive restructuring. (*Id.* at 16-17)

On August 19, 2015, state agency psychologist Jane Curran, Ph.D reviewed Meade's record and agreed with Dr. Suansilppongse's findings that Meade did not have a severe mental impairment. (D.I. 12-3 at 23-24)

Meade underwent an MRI of his brain in February 2016 which revealed "[m]ultiple scattered foci of increased signal in the bifrontal and left periventricular and subcortical white matter . . . with many foci seen near the grey-white junction in the frontal and left parietal lobes. These are nonspecific and most likely represent combination of chronic small vessel ischemic changes and foci of shear axonal injury given clinical history." (D.I. 12-9 at 20) Dr. Afield indicated that the MRI results were consistent with his clinical findings. (*Id.* at 22) Meade also

5

underwent additional tests in connection with the NFL litigation. (*Id.* at 10-15) Dr. Afield noted that Meade's WMS-IV scores showed various levels of impairment, his language test scores showed severe impairment, he showed moderate impairment in complex attention and processing speed, and mild to moderate impairment in executive functioning. (*Id.* at 10-12) Dr. Afield described Meade as flexible in social situations, but explained that Meade has moderate to severe memory loss which interferes with his daily activities. (*Id.* at 13-14) Dr. Afield noted a mild impairment in personal care, and severe cognitive decline. (*Id.* at 14)

Meade had follow-up visits with Dr. Afield in April, June, and July of 2016. (D.I. 12-9 at 23-31) Dr. Afield described Meade's worsening symptoms, as Meade reported having difficulty with getting out of bed, cooking, eating, cleaning, and socializing. (*Id.* at 23) Meade exhibited poor recent memory, concentration, attention, and judgment. (*Id.* at 30)

## C. Hearing Before the ALJ

### 1. Meade's Testimony

At the hearing on April 13, 2017, Meade testified that he was 57 years old, he was divorced with two grown children, and he lives alone. (D.I. 12-2 at 39, 42-43) Meade stopped working in 2010, and stated he can no longer do his previous work because he cannot think quickly or negotiate. (*Id.* at 41, 52) In 2010, Meade trained for a sales job but was not hired because he had difficulty remembering the sales pitch script. (*Id.* at 46) He earned \$2,600 for completing the training portion. (*Id.*)

Meade testified that he was involved with the NFL lawsuit concerning traumatic brain injury and that he was diagnosed with early onset dementia. (D.I. 12-2 at 44) At the time of the hearing, the settlement had just recently been approved. (*Id.* at 45) Also in relation to the NFL,

6

Meade testified that he received a net amount of $150,000 in workers compensation in 2009 or 2010. (*Id.* at 45)

In 2015, Meade participated in the NFL Heads Up program, where ambassadors spoke to coaches, parents, and kids about safety in youth football for a minimal amount of money. (*Id.* at 45, 58-59) Meade acknowledged that his position with Heads Up ended only because the NFL discontinued the program in 2016. (*Id.*)

Meade stated that he is able to drive, but his activities have decreased and he no longer wants to spend time with family members or other people. (*Id.* at 43-44, 47-48, 51) Meade testified that he felt depressed and suffered from memory problems. (*Id.* at 46-49) Meade suffers from throbbing headaches. (D.I. 12-2 at 52) Meade stated that he cannot sit for more than an hour, he can walk a couple of blocks without stopping, he has no difficulty standing up, and he can lift twenty pounds. (*Id.* at 54)

## 2. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("The VE"):

[A]ssume that you're dealing with an individual of the same age as the claimant, he's now 57, with the same college education and the same past work experience. I want you to begin by assuming that this individual retains the functional capacity for light work but would be limited to only occasional stooping, kneeling, crouching, crawling, capable of climbing ramps or stairs, but this individual would be incapable of climbing ladders, ropes or scaffolds or performing tasks requiring good balance or performing any work at unprotected heights. Could this individual perform any of the past work?

(D.I. 12-2 at 62-63) The VE testified that such a hypothetical individual could perform the claimant's past work. (*Id.*) The VE's answer did not change when the ALJ posed the same hypothetical individual who was also limited to occasional overhead reaching. (*Id.* at 63) However, if the hypothetical individual was limited to only simple, routine, and repetitive tasks with only brief superficial interaction with the public or coworkers, the VE testified that

7

individual could not perform any of the claimant's past work. (*Id.* at 64) The VE opined that Meade's past work included highly specialized jobs, and transferrable skills from his past work to semi-skilled light or sedentary positions would include other general sales positions, such as appliance sales, general hardware sales, or clothing sales that Meade could perform. (*Id.* at 63-64)

## D.  The ALJ's findings

Based on the factual evidence in the record and the testimony of Meade and the VE, the ALJ determined that Meade was not disabled under the Act for the relevant time period from February 12, 2015 through March 31, 2016, the date last insured. (D.I. 12-2 at 16-30) The ALJ found, in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2016.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 12, 2015 through his date last insured of March 31, 2016 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: post-concussion syndrome; degenerative joint disease; degenerative disc disease; and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: the claimant was limited only to occasional stooping, kneeling, crouching, crawling, and climbing of ramps or stairs. Additionally, he was limited to work that did not involve balancing, climbing of ladders, ropes, or scaffolds, or work at unprotected heights.

6. Through the date last insured, the claimant was capable of performing past relevant work as a stock salesperson, mortgage salesperson, and general

8

salesperson. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 12, 2015, the alleged onset date through March 31, 2016, the date last insured (20 CFR 404.1520(f)).

(D.I. 12-2 at 16-30)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for

9

a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

10

## IV. DISCUSSION

### A. Disability Determination Process

The core issue in this case is whether Meade was disabled within the meaning of the Act at any time from February 12, 2015, the allege onset date, through March 31, 2016, the date last insured. (Tr. at 29) Title II of the Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen*, 826 F.2d 240, 244 (3d Cir. 1990).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* § 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in

11

substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age,

12

education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**B.    Whether the ALJ's Decision is Supported by Substantial Evidence**

On May 24, 2017, the ALJ found that Meade was not disabled from February 12, 2015, the alleged onset date, through March 31, 2016, the date last insured. (D.I. 12-2 at 30) The ALJ concluded that, despite Meade's severe impairments (post-concussion syndrome, degenerative joint disease, degenerative disc disease, and obesity) he had the RFC to perform light work with limitations (occasional stooping, kneeling, crouching, crawling and climbing or ramps or stairs; never balancing, climbing of ladders, ropes, scaffolds, or work at unprotected heights). (*Id.* at 18-23)

Meade asserts three main arguments on appeal: (1) the ALJ erred at step two of the analysis by failing to identify Meade's neurocognitive disorders as a severe impairment, (2) the ALJ erred in failing to afford proper weight to the opinions of Meade's examining neurologists and psychologists, and (3) the ALJ erred in his credibility finding by failing to acknowledge Meade's strong work history. (D.I. 15)

**1.    Severity findings**

At steps two and three, the Commissioner is required to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments that are severe enough to preclude any gainful work, in which the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii) & (iii). Meade bears the burden of demonstrating that an impairment is "severe." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy the standard, Meade must

13

show that the impairment is more than "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling 85-28, 1985 WL 56856, at *3; *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); 20 C.F.R. § 404.1520(c).

Meade contends that the ALJ failed to consider his neurocognitive disorder, which resulted in an RFC that does not address all of Meade's impairments. (D.I. 15 at 11) Meade alleges that the ALJ erred by including no mental limitations in the RFC assessment, and asserts that he should be limited to unskilled work due to his neurocognitive impairment, which would preclude performance of his past work. (*Id.* at 12-13)

In response, the Commissioner contends that the ALJ appropriately found Meade's mental limitations were non-severe based on his conclusion that Meade had only mild limitations with respect to his capacity for concentrating, persisting, or maintaining pace, interacting with others, understanding, remembering, or applying information. (D.I. 17 at 10) The Commissioner argues that Meade did not initially allege disability due to his mental health, and Meade's function report shows daily activities consistent with mild limitations stemming from his mental health impairment. (*Id.* at 11-12) Moreover, the Commissioner explains that Dr. Brandenburg's treatment notes and objective medical findings, as well as the reports of the state agency psychiatrist and psychologist, support the Commissioner's conclusion that Meade's mental impairments are mild. (*Id.* at 12-13) Even if the ALJ erred at step 2 of the analysis in finding Meade's mental impairments were non-severe, the Commissioner alleges that such error was harmless because the ALJ proceeded to find Meade had a number of other severe impairments. (*Id.* at 13)

14

The Third Circuit has held that finding an impairment to be severe at step two is "a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). Here, the ALJ's finding that Meade's mental impairments are non-severe is not supported by substantial evidence.

First, the ALJ cited Dr. Brandenburg's report that Meade was friendly and made good eye contact, his speech was normal, his thought process was logical and organized, and his attention and concentration were good, although he became frustrated with his perceived inability to perform well on the memory testing. (D.I. 12-2 at 20; D.I. 12-8 at 61) Dr. Brandenburg noted that Meade scored in the above-average range on the WAIS-IV test, but his WMS-IV score was lower than expected given his WAIS-IV performance, indicating memory impairment. (D.I. 12-2 at 20; D.I. 12-8 at 62-64) However, his scores on the WMS-IV test still fell within the average to low-average range. (D.I. 12-2 at 20; D.I. 12-8 at 63) Although Dr. Brandenburg provided no statement regarding Meade's capacity for work-related tasks, the ALJ construed these findings to signify only a mild mental impairment. In this regard, the ALJ seems to have substituted his own lay opinion in interpreting the decidedly mixed findings of Dr. Brandenburg. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("[A]n ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence.").

Next, the opinions of the state agency psychiatrist and psychologist do not constitute substantial evidence supporting the ALJ's severity determination of Meade's neurocognitive impairment. Dr. Suansilppongse found that Meade's mental impairments did not cause more than mild limitations with respect to his activities of daily living, social functioning, concentration, persistence, or pace, and therefore are non-severe. (D.I. 12-2 at 26; D.I. 12-3 at 9-

15

10) Dr. Curran subsequently agreed with Dr. Suansilppongse's findings that Meade did not have a severe mental impairment. (D.I. 12-2 at 26; D.I. 12-3 at 23-24) Both of these opinions were based primarily on the assessment of Dr. Brandenburg, whose findings presented a mixed picture of the severity of Meade's mental limitations. As discussed further at § IV.B.2, *infra*, the ALJ assigned no weight to Dr. Brandenburg's assessment because Dr. Brandenburg offered no statement regarding Meade's capacity for work-related tasks, despite assigning great weight to the opinions of the state agency psychiatrist and psychologist, who based their opinions primarily on the assessment of Dr. Brandenburg. (D.I. 12-2 at 26-27) Such internal inconsistencies in the ALJ's decision do not support a conclusion that the ALJ's severity finding was based on substantial evidence. *See Dowd v. Berryhill*, 2018 WL 3448537, at *7 (M.D. Pa. July 2, 2018) (noting that the ALJ must consider medical opinion evidence in relation to "the record as a whole." (quoting 20 C.F.R. § 404.1527(c)(4)).

## 2. Opinions of Meade's examining physicians

Meade argues that the ALJ failed to give proper weight to the medical opinions of three examining sources in evaluating Meade's mental impairments. (D.I. 15 at 13-16) First, Meade notes that the ALJ rejected Dr. Martinez's opinion as being based on Meade's subjective complaints,[4] despite an assessment of his neurocognitive impairment based on the objective Montreal Cognitive Assessment Scale. (*Id.* at 12) During the neurological examination, Dr. Martinez noted that Meade had difficulty with calculations, drawing a clock, and drawing a three-dimensional box, and he could not remember three objects for five minutes. (D.I. 12-8 at 80) The ALJ characterized these findings as part of Dr. Martinez's assessment of Meade's

---

[4] The ALJ also indicated that the opinion of Dr. Afield was based primarily on Meade's subjective complaints. (D.I. 12-2 at 27) Yet Dr. Afield administered the WAIS-IV and WMS-IV tests, and he discussed the results of those tests at length in his report. (D.I. 12-9 at 10-15)

subjective report as opposed to objective testing. (D.I. 12-2 at 20) However, these criteria are part of the Montreal Cognitive Assessment Scale, which is an objective test to measure mild cognitive impairment that was administered by Dr. Martinez during his neurological examination of Meade. *See* Mental Assessment in Older Adults: Montreal Cognitive Assessment; https://consultgeri.org/try-this/general-assessment/issue-3.2.pdf. Thus, the ALJ erred in finding that Dr. Martinez's assessment was based largely upon Meade's subjective complaints as opposed to objective testing. (D.I. 12-2 at 20-21)

The ALJ also explained that he gave the opinions of Dr. Afield and Dr. Martinez little weight because their evaluations were performed in connection with the NFL litigation and were therefore adversarial in nature. (D.I. 12-2 at 27) However, "an ALJ may not discount a medical opinion's reliability because the physician was retained by counsel in anticipation of litigation." *Barrios v. Colvin*, 2016 WL 3964815, at *5 (S.D. Fla. Mar. 18, 2016) (citing *Tavarez v. Comm'r of Soc. Sec.*, 638 F. App'x 841, 847 (11th Cir. 2016) (rejecting the ALJ's reasoning to afford a medical opinion little weight where the physician was retained by the plaintiff's attorney and the opinion was primarily based on the plaintiff's subjective complaints)). "[T]he mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report." *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998); *see Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009). Consequently, the ALJ erred in his reasoning for assigning little weight to the opinions of Dr. Afield and Dr. Martinez based on their retention for purposes of the NFL litigation.

The ALJ also erred in failing to assign specific weight to Dr. Brandenburg's opinion. The ALJ must determine how much weight to assign a medical opinion by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment

17

relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. § 404.1527(d). Here, the ALJ gave no specific weight to Dr. Brandenburg's assessment because she failed to provide an assessment of Meade's ability to perform work-related tasks. (D.I. 12-2 at 27) However, Dr. Brandenburg opined that Meade had a memory impairment after considering the results of the WAIS-IV and WMS-IV testing. (D.I. 12-8 at 62-64) The ALJ cited the results of Dr. Brandenburg's testing in attributing little weight to the opinions of Dr. Afield and Dr. Martinez.[5] (D.I. 12-2 at 27-28) Thus, the ALJ's assertion that he assigned Dr. Brandenburg's opinion no weight is not consistent with the balance of the ALJ's decision.

Meade also argues that the ALJ erred by giving great weight to the state agency reviewers, Dr. Suansilppongse and Dr. Curran, because they did not have access to Dr. Afield's report or Dr. Martinez's report. (D.I. 15 at 18) Dr. Suansilppongse's evaluation occurred in December 2014, more than a year before Dr. Afield and Dr. Martinez conducted their examinations in May 2015. (D.I. 12-2 at 10; D.I. 12-8 at 68-72, 77-81) Although Dr. Curran's report was made in August 2015, a few months after the examinations by Dr. Afield and Dr. Martinez, Dr. Curran could not evaluate their reports because Meade did not update his disability report to include evidence of his mental impairments until October 2015. (D.I. 12-2 at 24; D.I. 12-6 at 38-45; D.I. 12-8 at 68-72, 77-81) The Third Circuit has held that, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report

---

[5] Meade also alleges that the ALJ's decision ignores the consistency of the objective findings and conclusions of Dr. Afield and Dr. Brandenburg after administering the same WAIS-IV and WMS-IV tests. (D.I. 15 at 16) Specifically, both Dr. Afield and Dr. Brandenburg noted significant differences between Meade's actual and predicted scores regarding his working memory, suggesting an impaired memory. (D.I. 12-8 at 64; D.I. 12-9 at 10) The ALJ did not address this point in weighing the opinions of the examining physicians.

and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Dr. Suansilppongse and Dr. Curran reviewed all available evidence in the record at the time of their reports.

Nonetheless, the ALJ's assignment of great weight to the opinions of Dr. Suansilppongse and Dr. Curran is inconsistent with the balance of the ALJ's decision. Dr. Suansilppongse and Dr. Curran based their determinations in large part on Dr. Brandenburg's November 2014 assessment of Meade's condition. (D.I. 12-3 at 2-15, 17-28) However, the ALJ assigned no specific weight to Dr. Brandenburg's assessment because she "failed to provide a statement as to the claimant's capacity for work-related tasks." (D.I. 12-2 at 27)

Having determined that the ALJ erred in his analysis of the medical opinions of record, the court must consider whether the errors are harmless. *Seaman v. Soc. Sec. Admin.*, 321 F. App'x 134, 135 (3d Cir. 2009). An ALJ's failure to assign weight to an examining physician's opinion is harmless if the ALJ develops an RFC consistent with the medical findings. *See Dries v. Berryhill*, 2017 WL 4922011, at *2 (M.D. Pa. Oct. 31, 2017) (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012); *Lara v. Comm'r of Soc. Sec.*, 2017 WL 3098126, at *6 (11th Cir. July 21, 2017); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013)). Here, the errors are not harmless because the ALJ's RFC assessment was substantially based on the ALJ's assignment of great weight to the non-examining state agency sources, who found less restrictive limitations than Dr. Afield and Dr. Martinez. "[A] proper analysis of the examining source opinions could yield . . . limitations incompatible with" the skill level of Meade's prior work. *See Brown v. Berryhill*, 2017 WL

19

1471385, at \*10 (M.D. Pa. Apr. 25, 2017). For these reasons, remand is necessary to achieve a more fulsome explanation of the weight given to the opinions of the examining sources.

### 3. Credibility determination

Meade next argues that the ALJ did not properly consider Meade's strong work history, which bolsters his credibility. (D.I. 15 at 20-21) In response, the Commissioner alleges that the ALJ clearly considered Meade's work history, and notes that a claimant's long work history does not automatically bolster the claimant's credibility. (D.I. 17 at 19) According to the Commissioner, the ALJ's failure to specifically note Meade's long work history does not rise above the level of harmless error. (*Id.* at 20)

The Third Circuit has held that an individual may be entitled to consideration of their long work history in the assessment of their credibility of symptoms. *Dobrowolsky v. Califano*, 606 F. 2d 403, 409 (3d Cir. 1979). However, an ALJ is "not required to equate a long work history with enhanced credibility," particularly if the claimed symptoms do not match the evidence of record. *Passaretti v. Colvin*, 2015 WL 5679510 at \*10 (M.D. Pa. Sept. 24, 2015) (*citing Britig v. Colvin*, 2014 WL 5410645 at \*10 (W.D. Pa. Oct. 23, 2014)).

The ALJ did not err in failing to expressly consider Meade's extensive work history. Meade highlights evidence showing that he had earnings for "all but 6 quarters out of a possible 120 quarters between 1982 and 2011." (D.I. 15 at 20) However, in the four years in between his last income in 2010 and when he filed for DIB in 2014, Meade made no attempt to work beyond his participation in the Heads Up Program, where he earned a minimal amount of money. (D.I. 12-2 at 16-30)

The ALJ noted Meade has only received minimal, routine treatment with no surgeries recommended or received for his physical impairments; and has not received counseling or

medical treatment for his mental impairments from a local provider. (D.I. 12-2 at 28-29) The

ALJ also stated that he gave Meade "the benefit of every possible doubt and credit[ed] his

testimony to the extent that it was consistent with the medical evidence," and found that his

allegations "are not supported by the evidence as a whole." (*Id.* at 29) Thus, the ALJ did not err

in failing to find Meade deserved "enhanced credibility" based on his work record.

## V. CONCLUSION

For the foregoing reasons, Meade's motion for summary judgment is granted-in-part (D.I.

14), the Commissioner's cross-motion for summary judgment is denied (D.I. 16), and the case is

remanded for further proceedings limited to whether Meade has mental impairments and

limitations that should be included in the RFC assessment following the reevaluation of the

medical opinions and objective testing of record. An Order consistent with this Memorandum

Opinion shall issue.

Dated: March 15, 2019

Sherry R. Fallon

United States Magistrate Judge